UNITED STATES ARMY COURT OF CRIMINAL APPEALS

 Before
 TOZZI,[1] SIMS, and GIFFORD
 Appellate Military Judges

 UNITED STATES, Appellee
 v.
 Captain WARREN B. GILBERTSON
 United States Army, Appellant

 ARMY 20080428

 Headquarters, Fort Bragg
 Patrick J. Parrish, Military Judge
 Lieutenant Colonel John S.T. Irgens, Staff Judge Advocate

For Appellant: Captain Tiffany K. Dewell, JA (argued); Colonel Mark Tellitocci, JA; Lieutenant
Colonel Matthew M. Miller, JA; Major Bradley M. Voorhees, JA (on brief).

For Appellee: Captain Christopher B. Witwer, JA (argued); Colonel Michael E. Mulligan, JA; Major
Christopher B. Burgess, JA; Major LaJohnne A. White, JA; Captain Mark Goodson, JA (on brief).

 19 July 2011

 -----------------------------------
 MEMORANDUM OPINION
 -----------------------------------

 This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.

SIMS, Senior Judge:

 A military judge sitting as a general court-martial convicted appellant, pursuant to his
pleas, of attempting to commit an indecent act upon the body of a female under sixteen years of age,
conduct unbecoming an officer, knowingly attempting to persuade an individual under the age of
sixteen to engage in sexual activity in violation of 18 U.S.C. § 2422(b), and knowingly possessing
child pornography in violation of 18 U.S.C. § 2252(a)(5)(B) (three specifications), in violation of
Articles 80, 133, and 134, Uniform Code of Military Justice 10 U.S.C. §§ 880, 933, and 934
[hereinafter UCMJ]. The military judge sentenced appellant to dismissal from the service and
confinement for three years. The convening authority approved the adjudged sentence.
 This case is before the court for review under Article 66, UCMJ. Appellant has raised five
assignments of error, three of which (I, II, and III) merit discussion, and none of which merits
relief.[2] In support of his assignments of error, appellant submitted an affidavit that contains
numerous complaints, one of which includes an allegation that the convening authority failed to
provide appellant with a day of pretrial confinement credit to which he was entitled. [3] Because
the stipulation of fact mentions the credit and both the military judge and the trial counsel agreed
that appellant was entitled to a day of credit, we will address this oversight in our decretal
paragraph.

 FACTS

 In March 2007, appellant was a thirty-six-year-old unmarried commander of a Special Forces
Operational Detachment with more than eighteen years of military service and numerous successful
deployments. On 20 March 2007 appellant participated in an online chat with a Naval Criminal
Investigator who, as part of an ongoing sting operation, was posing as “Abby,” the fictitious
daughter of a Marine stationed at Camp Lejeune in Jacksonville, North Carolina. Although the
profile created for “Abby” contained a “profile picture” of a teen girl, it did not list her age.
Over the course of the next six days, appellant and “Abby” engaged in several chat sessions in which
they shared numerous personal details, discussed nudity, and explored sexual topics. On 26 March,
in response to a specific request from appellant, “Abby” sent him a picture of a “young, but
developed” female wearing a purple bikini that resembled the girl in the profile picture.

 After looking at the bikini picture, appellant complimented her on her eyes and told her that
her swimsuit was sexy. The following night, he again chatted with “Abby” and asked her if she had
ever seen a naked man. “Abby” responded that she had not, other than some drawings in health class
and a few “gross" photos sent to her online. Appellant then offered to hold “Abby” while naked and
told her he wanted her to kiss his neck. Thereafter, appellant exposed his buttocks and genitals
via his webcam, masturbated while still visible on the webcam, described the process of female
arousal, and asked “Abby” if she wanted to kiss his penis.

 By 29 March, appellant had suggested that they meet in person in order to engage in sexual
activity. After learning that “Abby’s” parents usually went out on Friday nights, appellant offered
to come to Jacksonville to get a hotel room for them to watch movies. During this chat session,
appellant again told “Abby” that he would “love” to have “a hot young girl with a sexy body getting
naked with” him. He told her he was looking at her bikini picture and that he “wished he could see
that kitty.” When “Abby” offered to wear the bikini to their meeting, appellant told her that he
did not know how long she would be wearing it. She responded by asking him if “he would like to be
her first.” He responded that he would be “honored.”

 During this chat session, appellant and “Abby” first discussed their differences in age. Just
eight minutes after having told “Abby” he was looking at her bikini picture, appellant asked her if
the difference in age between them bothered her. When she responded that it did not, appellant told
her that “a lot of people wouldn’t be cool with it at all.” He then indicated that neither of them
could tell their parents about each other. When appellant asked her how old she thought he was,
“Abby” said that she thought that he was “like 25.” Thereafter, appellant stated that he was
“guessing” she was fifteen. “Abby” confirmed appellant’s guess and told him she had just turned
fifteen a few months before. Appellant explained that initially he believed she was older when they
first started chatting, but he thought it was cool that she had recently turned fifteen. Upon
receiving confirmation that “Abby” was underage, he continued to chat with her as before and make
arrangements to meet for the purpose of watching movies and having sex.

 On the morning of 30 March, appellant again masturbated for “Abby” via webcam, taking the time
to explain both pre-ejaculate and semen to her. Later that same day, appellant again chatted with
her and asked her if her parents were still going to be out and if she still wanted to meet in
person. After receiving positive responses to both queries, appellant told her he would be arriving
in Jacksonville at around 1900 to procure a hotel room and would be contacting her online from there
to make final arrangements for their meeting.

 Appellant then proceeded to carry out his plan. He secured condoms, personal lubricant, and
his laptop computer and drove to Jacksonville. Upon arriving at the hotel, he contacted “Abby” and
chatted with her some more. At 2100, “Abby” told appellant she was getting in a cab to go to the
designated meeting locale outside a doctor’s office near a shopping mall. Appellant departed the
hotel, driving to the meeting spot, and parking in a nearby parking lot whereupon he was promptly
arrested at approximately 2115.

 After his arrest on 30 March, appellant admitted that he knowingly chatted with a fifteen-year-
old girl and had travelled to Jacksonville to meet her knowing that a “sexual encounter was entirely
possible.” While in custody, appellant executed letters of apology to both “Abby” and her parents
and gave consent for the search of his vehicle, hotel room, and residence. The search of his
residence yielded a mini compact disk, hand-labeled “PORN,” with an electronic volume name of
“TEEN_PORN” and which contained 181 images of child pornography divided into file directories
labeled “teen” and “preteen,” with the “preteen” directory containing a subdirectory labeled
“young.” The search also yielded a short child pornography video on appellant’s hard drive as well
as another compact disk containing a single image of child pornography. The seized pornographic
images involved female children who ranged in age from infant to thirteen years old.

 On 31 March 2007, appellant was turned over to his unit. He was relieved of his command and
assigned as a project engineer for the United States Army Special Operations Command. On 10
December 2007, after being given notice and the opportunity to submit matters, appellant’s Special
Forces tab was revoked. On 27 March 2008, appellant pleaded guilty at a general court-martial.

 DISCUSSION

 Unlawful Command Influence

It is a well-known axiom of military law that unlawful command influence (UCI) is “the mortal enemy
of military justice.” United States v. Gore, 60 M.J. 178, 178 (C.A.A.F. 2004) (citation and
quotation marks omitted). Article 37(a), UCMJ, provides that “[n]o person subject to this chapter
may attempt to coerce or . . . influence the action of a court-martial or any other military
tribunal or any member thereof, in reaching the findings or sentence in any case . . . .”
Accordingly, military appellate courts have consistently “condemned unlawful command influence
directed against prospective witnesses.” Gore, 60 M.J. at 185. Furthermore, even the mere
appearance of unlawful command influence is to be avoided as the appearance alone can be “as
devastating to the military justice system as the actual manipulation of any given trial.” United
States v. Ayers, 54 M.J. 85, 94–95 (C.A.A.F. 2000).
An accused has the initial burden of raising the issue of unlawful command influence. United States
v. Stombaugh, 40 M.J. 208, 213 (C.M.A. 1994). On appeal, appellant must: “(1) show facts which, if
true, constitute unlawful command influence; (2) show that the proceedings were unfair; and (3) show
that the unlawful command influence was the cause of the unfairness.” United States v. Simpson, 58
M.J. 368, 374 (C.A.A.F. 2003) (quoting United States v. Biagase, 50 M.J. at 150).
Before this court appellant alleges that he is a victim of UCI, both prior to trial and after his
trial. Specifically, appellant claims he was unable to obtain character references from fellow
officers because those officers had been intimidated by the actions of his company commander, Major
(MAJ) S, and his chain of command.
As evidence of pre-trial UCI, appellant cites to the following:
(1) MAJ S initiated a successful revocation of appellant’s Special Forces tab and told him he was a
“disgrace;”
(2) Both appellant and his wife had been told that the team sergeant, Sergeant First Class (SFC) W,
had issued a “gag order” to the enlisted soldiers in appellant’s unit;
(3) Four field grade officers appellant approached for favorable testimony at trial “refused” to
testify on his behalf.[4]
As evidence of post-trial UCI, appellant claims that his wife was told by MAJ R (a personal friend
to whom appellant owed $6000) that MAJ R would not provide a memorandum in support of appellant’s
clemency request because MAJ R had been told by the brigade judge advocate (BJA) that the “command
would see” the memorandum.
 The only corroboration of any of appellant’s UCI allegations are the fact that his Special
Forces tab was indeed revoked prior to his court-martial and that two of his potential character
witness used the word “inappropriate” in declining his request to serve as character witnesses for
appellant. Appellant has provided no affidavits from anyone other than himself to show that MAJ S,
SFC W, the BJA, or anyone else engaged in any actions that could reasonably have intimidated any of
the five field grade witnesses appellant claims would have testified in his favor and/or submitted
memoranda of support. Although appellant claims that he was told of the “gag-order” by Warrant
Officer 1 (WO1) G (who allegedly overheard SFC W publish the order), appellant has provided no
affidavit from WO1 G to that effect. Likewise, although appellant claims his wife was also told of
the “gag-order” by Staff Sergeant (SSG) M (who allegedly heard SFC W publish the order), appellant
has not submitted an affidavit from either SSG M or his own wife.

 Not only does appellant provide scant evidence of the factual basis for the complained-of UCI,
appellant fails to provide a logical link between the complained-of actions and the alleged harm.
For example, it is mere speculation on the part of appellant that the administrative revocation of
his Special Forces tab resulted in his becoming “persona non grata” and somehow served as a signal
to other members of the community that they should not assist him in preparing his defense or
requesting clemency.[5] Likewise, there might have been a logical connection between the alleged
gag-order and witness intimidation had appellant indicated to this court that he wanted to call as
witnesses one or more of the enlisted soldiers who heard the alleged “gag-order.” However, that is
not the case. The only witnesses appellant claims he would have called were the four field grade
Special Forces officers and WO1 G who could have testified as to appellant’s “planning and skill of
execution” and to the “effectiveness of the intelligence networks” created by appellant in
Afghanistan. It is unclear to us why appellant decided not to call WO1 G because it is obvious from
appellant’s affidavit that WO1 G was not in any way intimidated by SFC W; WO1 G allegedly told
appellant that “he wasn’t worried about it because he was a warrant officer and his [officer
evaluation reports] are not written by [SFC W].”
Finally, we are not persuaded that MAJ R was in any way unlawfully influenced by allegedly being
informed by a BJA, in response to a specific question from MAJ R, that the command would see a
memorandum of support from MAJ R if such a letter were to be submitted as part of appellant’s
submissions pursuant to Rule for Courts-Martial [hereinafter R.C.M.] 1105. That factually accurate,
and somewhat obvious, response, without further nefarious action by either the command or the BJA
simply does not raise the specter of UCI.
Appellant is asking this court to speculate on the effects of an administrative action, coupled with
the accurate advice of a BJA and the alleged “gag-order” issued by a noncommissioned officer.
However, he has failed to show any facts which, if true, would demonstrate that any of the field
grade officers he wanted to call as witnesses were in any way discouraged from assisting him or his
attorney. Furthermore, appellant admits that he was aware of most of the facts underlying his UCI
claim for months prior to his decision to plead guilty without raising UCI at trial.
Applying a beyond reasonable doubt standard, we find there are no facts which, if true, would
constitute either UCI or the appearance of UCI.
 Providence of Pleas and the Entrapment Defense
 Appellant contends his pleas of guilty were improvident because the military judge failed to
recognize that the facts of the case reasonably raised the entrapment defense.
“[W]e review a military judge’s decision to accept a guilty plea for an abuse of discretion and
questions of law arising from the guilty plea de novo.” United States v. Inabinette, 66 M.J. 320,
322 (C.A.A.F. 2008). See also United States v. Shaw, 64 M.J. 460, 462 (C.A.A.F. 2007). To
establish an adequate factual predicate for a guilty plea, the military judge must elicit “factual
circumstances as revealed by the accused himself [that] objectively support that plea . . . .”
United States v. Davenport, 9 M.J. 364, 367 (C.M.A. 1980). Once the military judge has accepted the
pleas and entered findings based upon them, we will not set them aside unless we find a substantial
conflict between the pleas and the accused’s statements or other evidence of record. Shaw, 64 M.J.
at 462. More than a “mere possibility” of conflict is required. Id. (citation and quotation marks
omitted). Instead, we must find “something in the record of trial, with regard to the factual basis
or the law, that would raise a substantial question regarding the appellant’s guilty plea.”
Inabinette, 66 M.J. at 322.

 The entrapment defense contains two elements: (1) “government inducement” and (2) “an accused
with no predisposition to commit the offense.” United States v. Howell, 36 M.J. 354, 358 (C.M.A.
1993). Inducement is more than merely providing the appellant the means or opportunity to commit a
crime, or deploying artifice or stratagems. Only “circumstances suggesting overreaching by [the]
government agent or any pressuring by him of appellant to commit these offenses” will suffice. Id.
at 360.

 We find that the record, as a whole, objectively supports that there was no overreaching on the
part of the government and that there was strong evidence that appellant was predisposed to commit
the offenses to which he pleaded guilty.

 Although the Naval Criminal Investigative Service (NCIS) agent who created the persona of
“Abby” failed to “disclose” “Abby’s age until the day prior to the planned meeting, she provided a
profile picture of a young girl as well as numerous indicators throughout the course of their chats
to make it very clear that she was not an adult. This was confirmed by appellant in his providence
inquiry when he told the military judge that based upon “certain things she had brought up in
conversation” he began to suspect she was under the legal age of consent prior to his “guessing”
that she was fifteen. As appellant further elaborated in his colloquy with the military judge,
after appellant received confirmation from “Abby” as to her age, he continued to chat with her “the
way [he] had been talking before” and “continued on with the meeting.”

 Even if we were to find that the NCIS agent had induced his participation, we find appellant’s
chat statement that he desired to have “a hot young girl with a sexy body getting naked with” him,
as well as his possession of a large amount of child pornography, serve as strong evidence of his
pre-existing sexual interest in children and his predisposition to commit the offenses to which he
admitted at trial.

 The fact that appellant was not told that “Abby” was fifteen years old until 29 March raises no
more than a mere possibility of entrapment. Therefore, we find that the military judge did not
abuse his discretion in failing to discuss the defense of entrapment with appellant. It is
sufficient that the military judge was aware of that fact and found the appellant guilty of conduct
occurring only after appellant was made aware of her age.

 Ineffective Assistance of Counsel

 “The right to counsel under the Sixth Amendment includes the right to the effective assistance
of counsel.” United States v. Dobson, 63 M.J. 1, 10 (C.A.A.F. 2006). See also Strickland v.
Washington, 466 U.S. 668, 686 (1984) (citing McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)).
“Ineffective assistance of counsel involves a mixed question of law and fact.” United States v.
Paxton, 64 M.J. 484, 488 (C.A.A.F. 2007) (citing United States v. Davis, 60 M.J. 469, 473 (C.A.A.F.
2005)). Factual findings are reviewed under a clearly erroneous standard, but a de novo standard of
review is used to ultimately determine whether there was ineffective assistance of counsel and
prejudice to the appellant. Id. “On appellate review, there is a ‘strong presumption’ that counsel
was competent.” Dobson, 63 M.J. at 10 (internal citations omitted).

 In Strickland, the Supreme Court established the following two-prong test for ineffective
assistance of counsel:

 First, the defendant must show that counsel’s performance was deficient. This requires
 showing that counsel made errors so serious that counsel was not functioning as the
 “counsel” guaranteed the defendant by the Sixth Amendment. Second, the defendant must
 show that the deficient performance prejudiced the defense. This requires showing that
 counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial
 whose result is reliable.

466 U.S. at 687. See also United States v. Wean, 45 M.J. 461, 463 (C.A.A.F. 1997).

 Our superior court has provided guidance for analyzing and applying the Strickland two-prong
test:

 Under the first prong of Strickland, which examines the issue of deficiency in
 performance, we ask: (A) Are appellant’s allegations true? (B) If so, is there a
 reasonable explanation for counsel’s actions? (C) If there is not a reasonable
 explanation, did defense counsel’s level of advocacy fall measurably below the
 performance ordinarily expected of fallible lawyers?

Dobson, 63 M.J. at 10. See United States v. Grigoruk, 56 M.J. 304, 307 (citing United States v.
Polk, 32 M.J. 150, 153 (C.M.A. 1991)).

 If counsel’s performance was deficient, the defense must then prove prejudice under the second
prong of Strickland. The defense must demonstrate “a reasonable probability that, but for counsel’s
unprofessional errors, the result of the proceeding would have been different.” Strickland, 466
U.S. at 694; Dobson, 63 M.J. at 10. “[I]f we conclude that any error would not have been
prejudicial under the second prong of Strickland, we need not ascertain the validity of the
allegations or grade the quality of counsel’s performance under the first prong.” Dobson, 63 M.J.
at 10 (quoting United States v. Saintaude, 61 M.J. 175, 179-180 (C.A.A.F. 2005)).

 Appellant alleges that his civilian defense counsel (Mr. W) was ineffective in three main ways,
two of which revolve around discovery issues and one of which involves pre-trial punishment.

 We turn to appellant’s first allegation of counsel error in which he claims Mr. W failed to
file a discovery request that would have resulted in the production by the government of an
allegedly defective warrant application that resulted in the discovery of the “child pornography”
after appellant claims to have withdrawn his search consent. Appellant argues that if his counsel
had filed a discovery request, he would have received the allegedly defective warrant application
and should then have filed a motion to suppress the results of the search carried out pursuant to
that warrant. We find appellant’s claim to be tenuous and unsupported by the evidence in the record
before us.

 Second, appellant alleges that Mr. W was ineffective in failing to file a discovery request
that would have resulted in the discovery of chat logs that referred to a picture of a woman in a
bikini, which picture arguably would have supported appellant’s post-trial claims that he was
entrapped because he thought “Abby” was of legal age prior to 29 March 2007. Appellant was clearly
aware of the existence of this bikini picture because he had viewed it several times and it was
prominently mentioned in the stipulation of fact and during his providence inquiry. Most
importantly, appellant does not claim that he ever discussed the picture with Mr. W or conveyed to
him that he believed the picture showed an adult.

 Third, appellant alleges that Mr. W was ineffective in not recognizing or raising illegal pre-
trial punishment in the sentencing phase of his trial. In support of his allegation, appellant
claims that the revocation of his Special Forces tab, his being told by MAJ S that he was a
“disgrace,” his perceived banishment from the “brotherhood” of Special Forces soldiers, and his two-
day stay at a psychiatric ward followed by a two-week stay in the barracks amounted to illegal pre-
trial punishment, which should have been recognized and raised by Mr. W. However, appellant does
not claim to have told Mr. W about anything other than the revocation of the Special Forces tab. We
find that the alleged response of Mr. W that the revocation was an “administrative” matter that had
“no bearing on the investigation or trial” to be correct. Furthermore, the stipulation of fact,
which was signed by appellant, admitted during his trial, and contained the revocation as an
attachment, noted that he had served one day of pretrial confinement and stated that “[n]o other
pretrial confinement, or restriction tantamount to pretrial confinement, has been implemented.”
Additionally, when asked by the military judge if there were any “issues under Article 13[, UCMJ]
and pretrial punishment,” Mr. W, in the presence of appellant, answered that there were not.

 We also note that Mr. W successfully negotiated a pretrial agreement that limited appellant’s
exposure to three years of confinement when he was initially facing confinement for life. At trial,
Mr. W, supported by the sworn and unsworn testimony of appellant, followed a strategy of portraying
his client as a hard-working, heroic, and dedicated soldier who was genuinely remorseful for his
misconduct and who cooperated immediately and fully with both the investigators and his chain of
command from the time of his apprehension until his guilty plea. By pursuing this reasonable
strategy, Mr. W obtained a three-year sentence from the military judge. Following the trial,
appellant retained a different civilian defense counsel who adopted Mr. W’s strategy in his
submissions pursuant to R.C.M. 1105.[6]

 In evaluating the performance of appellant’s counsel in the context of appellant’s guilty plea,
we fail to see how any of the complained-of errors, even if true, prejudiced appellant. We are
therefore unconvinced that “there is a reasonable probability that, but for counsel’s errors,”
appellant would have abandoned the protections of his very favorable pre-trial agreement and instead
“insisted on going to trial.” Hill v. Lockhart, 474 U.S. 52, 57-59 (1985). Our review of the
entire record fully satisfies us that appellant received effective representation of counsel.

 Conclusion

On consideration of the entire record, to include those matters raised personally by the appellant
in his affidavit and pursuant to Grostefon, 12 M.J. 431, we hold the findings of guilty and the
sentence as approved by the convening authority to be correct in law and fact. Accordingly, the
findings of guilty and the sentence are AFFIRMED. Appellant shall be credited with one (1) day of
credit towards his adjudged sentence of confinement.
Senior Judge TOZZI and Judge GIFFORD concur.
 FOR THE COURT:

 MALCOLM H. SQUIRES, JR.
 Clerk of Court

-----------------------
[1] Senior Judge TOZZI took final action in this case prior to his permanent change of duty station.
[2] Appellant alleged the following assignments of error:

 I.

 Whether unlawful command influence by maj sabine tainted cpt gilbertson’s court-martial.

 II.

 Appellant’s pleas of guilty to charge ii, and specification 1 of charge III, were
 improvident where the defense of entrapment was reasonably raised by the evidence and the
 military judge declined to identify the affirmative defense and elicit facts from
 appellant disclaiming and disproving the entrapment defense.

 III.

 Whether CPT Gilbertson’s pleas and trial were tainted by ineffective assistance of
 counsel pertaining to government non-disclosure of favorable evidence, and unreasonable
 search and seizure.

 IV.

 Charge i and its specification fail for legal insufficiency under [united States] v.
 miller, 67 m.j. 87 (c.a.a.f. 2008) and relevant precedent where [ARTICLE 134, UCMJ]
 convictions for indecent acts upon the body of a child, under [ARTICLE 80, UCMJ] attempt
 theories, require the physical presence of a child’s body.

 (continued . . .)

(continued . . .)

 V.

 the cumulative effect of the errors in this case effectively denied the appellant his
 right to the due process of law and to a fair trial, and thus, requires that this court
 set aside the conviction and sentence.

[3] In his thirty-nine-page affidavit, appellant raises numerous issues, some of which are
referenced in appellate defense counsel’s brief and some of which are not. In that affidavit,
appellant also makes numerous factual assertions which are in conflict with evidence contained in
the stipulation of fact and/or appellant’s sworn testimony to the military judge. In an abundance
of caution, we will treat those issues and assertions raised solely by appellant as submissions
pursuant to United States v. Grostefon, 12 M.J. 431 (C.M.A. 1982).
[4] According to appellant’s affidavit and emails filed as appellate exhibits, only two officers
(Lieutenant Colonel K and MAJ M) actually refused to assist appellant. Of the two others, one (MAJ
F) indicated that he was deployed and would have to respond in writing and the other (Colonel B)
apparently never responded at all.
[5] It is interesting to note that appellant characterizes the Special Forces community as being a
“mafia” like organization where tabbed soldiers are “made men” who are expected to “cover” for each
other and “not report on their brothers.” The clear implication of the appellant’s characterization
of the Special Forces community is that had he retained his tab, he would have been able to bring in
witnesses, not only to testify in his favor but possibly to perjure themselves for him as well.
[6] The appellant’s post-trial submission under R.C.M. 1105 contained no references to UCI,
entrapment, illegal pretrial punishment, restriction tantamount to confinement, or ineffective
assistance of counsel.